UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

STEVEN SIRACUSA,

*Plaintiff,*

– against –

NEW HYDE PARK-GARDEN CITY UNION
FREE SCHOOL DISTRICT; JENNIFER
MORRISON-RAPTIS, *Superintendent of New
Hyde Park-Garden City Union Free School
District, in her official and individual
capacity*; KIM LAREGINA, *Director of
Curriculum and Instruction of New Hyde
Park-Garden City Union Free School District,
in her official and individual capacity,*

*Defendants.*

**MEMORANDUM & ORDER**
24-cv-01002 (NCM) (LGD)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Steven Siracusa brings the instant action against defendants New Hyde Park-Garden City Union Free School District (the "School District"), Dr. Jennifer Morrison-Raptis, and Kim LaRegina (together, "defendants"). Plaintiff seeks to enjoin defendants from terminating his employment under New York State Education Law § 3020-a ("3020-a") or from taking other adverse employment actions against him during the pendency of this action. In the alternative, plaintiff moves for a preliminary injunction restraining defendants from continuing 3020-a disciplinary hearings against him until a new hearing officer is assigned. For the reasons that follow, plaintiff's motion is denied in its entirety.

**BACKGROUND**

Plaintiff has been employed with the School District as a music teacher for approximately 20 years. Compl. ¶ 13, ECF No. 1. For the past several years, Mr. Siracusa split his time teaching at two schools in the School District: New Hyde Park Road School ("New Hyde Park") and Garden City Park School ("Garden City Park"). Compl. ¶ 14.

*A.  2020 and 2021 School Terms*

During the 2020–2021 school year, the School District implemented precautions to "decrease the spread" of COVID-19, including the use of a cleaning solution called Virex II ("Virex") to clean and disinfect buildings. Defs.' Memo. of Law in Opp'n to Pl.'s Order to Show Cause ("Opp'n") 8,[1] ECF No. 16. On January 8, 2021, plaintiff emailed defendant Dr. Morrison-Raptis, the District Superintendent, to inform her that he was experiencing "widespread skin rashes, shortness of breath, coughing, wheezing, and eye/vision issues" as a result of the schools' spraying of Virex. Compl. ¶¶ 16–17.

Plaintiff provided the School District with a letter from his dermatologist opining that Virex should not be sprayed and sharing "the safety and health risks associated with the aerosolization" of Virex. Compl. at ¶ 17. Shortly thereafter, defendant Dr. Morrison-Raptis, defendant LaRegina, the School District's Director of Facilities and Grounds, and the Assistant District Superintendent met with plaintiff to discuss his concerns. Compl. ¶ 18. In that meeting, plaintiff repeated his dermatologist's guidance and belief that plaintiff's symptoms "were the result of the aerosolization of [Virex]." Compl. ¶ 19. After notifying plaintiff, Ms. LaRegina called his dermatologist "to get more information about

---

[1]      Where necessary, page numbers for the Order to Show Cause Brief, Opposition, and Reply refer to the page numbers assigned in ECF filing headers.

Mr. Siracusa's potential issues with exposure to Virex" and "find out what need[ed] to be done for [his] allergies" but was unable to reach her. LaRegina Aff. ¶¶ 9–12, ECF No. 16-4; Preliminary Injunction Hr'g Tr. ("Hr'g Tr.") 10:2–12:12, July 11, 2024 (draft on file with court).

The School District continued to spray Virex, Compl. ¶ 20, but provided plaintiff with a cleaning schedule so that he could "avoid freshly cleaned areas," Opp'n at 8; LaRegina Aff. ¶¶ 10, 13; *see also* Compl. ¶ 20. Plaintiff links the Virex spraying to his continued symptoms, including "widespread skin rashes," "a near-constant burning sensation in his eyes," and "shortness of breath." Compl. ¶ 22.

During the 2021–2022 school year, the School District continued its safety precautions. LaRegina Aff. ¶ 6. Plaintiff's teaching schedule changed, requiring him to teach daily at both New Hyde Park and Garden City Park rather than teach three days at New Hyde Park and two days at Garden City Park. Compl. ¶¶ 14, 26. Plaintiff also alleges that in March 2021, in response to a supply request, Ms. LaRegina stated, "we don't get supplies for those who complain." Compl. ¶ 24. An independent investigation organized by the School District later concluded that plaintiff could not corroborate this allegation and Ms. LaRegina denied making this statement. Investigative Report and Discussion ("Investigative Report") 27, ECF No. 20-3; Hr'g Tr. 15:20–22.

### B.  *2022 School Term*

At the beginning of the 2022–2023 school year, plaintiff was informed that he would not have permanent classrooms in which to teach at either New Hyde Park or Garden City Park. Compl. ¶¶ 29, 31. Instead, at New Hyde Park, plaintiff was informed that he could teach in the auditorium for the school year. Compl. ¶ 31. Soon after, plaintiff

was informed that he could not permanently teach in the New Hyde Park auditorium. Compl. ¶ 35. Approximately one month later, Ms. LaRegina permitted Plaintiff to use a "garbage/storage room" ("Room 105") to teach. Compl. ¶ 39. Plaintiff emptied and cleaned Room 105 himself in order to "make it hospitable for student classes." Compl. ¶ 39.

Later that year, the Garden City Park principal also moved plaintiff—an orchestra teacher—from the school's computer lab, where he had been conducting music classes, to a "small office, no larger than approximately 150 square feet" to teach and hold rehearsals for classes of "nearly 30 students." Compl. ¶ 41. Plaintiff claims that a female band teacher was "never relocated nor placed in . . . small and incompatible" locations. Compl. ¶ 43.

Administrative decisions regarding plaintiff's teaching resources culminated in June of 2023. On June 9, 2023, all New Hyde Park teachers were e-mailed information on room changes for the upcoming school year. Hr'g Tr. 35:19–36:6. Plaintiff disputes reading that email, which indicated plaintiff would have to move rooms again. LaRegina 3020-a Test. 564:21–567:20, ECF No. 29-1. According to Ms. LaRegina, room change decisions were made between several administrators based on "the needs of the children." *See, e.g.*, Hr'g Tr. 33:22–34:17. On June 12, 2023, a New Hyde Park special education teacher, Cindy Hazleton ("Ms. Hazleton"), informed plaintiff that she would be using Room 105 for the 2023–2024 school year. Compl. ¶ 44. Plaintiff visited Ms. LaRegina, "upset that he and Ms. Hazleton had been assigned to switch classrooms," and voiced disapproval of this administrative change. LaRegina Aff. ¶ 22.

Tensions reached an even greater height on June 14, 2023, when Ms. Hazleton again visited Room 105 in preparation for the impending room switch. Compl. ¶ 45. After speaking with Ms. Hazleton, plaintiff confronted Ms. LaRegina in a New Hyde Park

hallway, stating that "Ms. Hazleton was trying to steal his room," and "yelling and behaving in an aggressive way." LaRegina Aff. ¶¶ 27, 28, 31. The altercation moved to Ms. LaRegina's office, and, at some point, a security guard arrived outside. Hr'g Tr. 47:2–48:8. Eventually, Mr. Siracusa returned to Room 105. LaRegina Aff. ¶¶ 32–33.

Shortly thereafter, Dr. Morrison-Raptis, Ms. LaRegina, the Assistant Principal, and a security guard went to Room 105 to inform Mr. Siracusa that his behavior was inappropriate and instruct him to leave work for the day. LaRegina Aff. ¶ 33–35; *see also* Recording of June 14 Meeting 04:32–:55, ECF No. 20-4 ("June 14 Recording") (audio on file with the Court). In the same encounter, which was secretly recorded by plaintiff, he denied "screaming" at Ms. Hazleton and explained his belief that he was being "retaliated against." June 14 Recording 05:01–07:30. Plaintiff also claims to have been "typing up a harassment complaint" against the administration before others followed him to Room 105. *See* Hr'g Tr. 51:5–19.

After this series of confrontations, plaintiff left New Hyde Park accompanied by security. Compl. ¶ 54; LaRegina Aff. ¶ 35. Ms. LaRegina testified that she did not contemplate whether she would allow plaintiff to return on June 15 or any day after, but was instead focused on "protecting the staff and students on June 14." Hr'g Tr. 53:22–54:17. The following day, Ms. LaRegina emailed plaintiff informing him that he was on administrative leave "effective immediately." Compl. ¶ 55.

### C. *Initiation of 3020-a Proceedings Against Plaintiff*

That summer, the School District contacted plaintiff informing him that he was required to attend a New York Education Law Section 913 medical evaluation. Compl. ¶ 57. Plaintiff was evaluated by Dr. Randall Solomon, an independent psychiatrist, on

August 31, 2023. At the evaluation, plaintiff showed Dr. Solomon his unfiled draft SDHR complaint to "convince him to drop this whole thing."[2] Hr'g Tr. 68:1–69:18. Dr. Solomon determined that plaintiff was "not mentally fit to return to his position as a teacher in the District." 3020-a Charge Preference 1, ECF No. 7-3.

On December 5 and 6, 2023, the School District served plaintiff at his residence with, first, a letter informing him of the charges to be brought against him pursuant to 3020-a; and then documents specifying the charges against him. Compl. ¶ 62; 3020-a Charge Preference 1. The charges allegedly followed a call from a School District labor counsel who "threatened that if [plaintiff] did not agree to resign by the end of the school year, the District would bring Section 3020-a charges against him . . . ." Decl. of Bryan D. Glass, Esq. in Supp. of Pl.'s Order to Show Cause ¶ 7, ECF No. 7-1 ("Glass OTSC Decl.").

On or about January 4, 2024, plaintiff's New York State Union of Teachers ("NYSUT") lawyer, Deena Mikhail, agreed to the selection of Mr. Barry Peek as the hearing officer for plaintiff's 3020-a hearing. Aff. in Supp. of Mot. for Recusal ¶ 4, ECF No. 7-4 ("Recusal Aff."). Plaintiff subsequently objected to this selection and dismissed Ms. Mikhail because she "refus[ed] to acknowledge failing to share the list of hearing officers with [Plaintiff] before selecting Mr. Peek . . . ." Glass OTSC Decl. ¶ 12. Mr. Peek declined plaintiff's requests that he "recuse himself," *see* Recusal Aff. ¶ 1, because plaintiff did not explain why Mr. Peek's appointment would pose a conflict of interest or otherwise prejudice him, *see, e.g.*, Feb. 22, 2024 Hr'g Tr. 33:13–18, 36:8–19, ECF No. 15-2. Plaintiff's 3020-a hearing began on March 20, 2024, and is still ongoing. Apr. 15 Ltr. by Steven Siracusa ("Apr. 15 Ltr."), ECF No. 23; Hr'g Tr. 92:24–93:12.

---

[2]    Plaintiff's counsel did not explain his belief that Dr. Solomon had control over ceasing defendants' disciplinary actions or medical evaluation.

During his 3020-a proceeding, plaintiff initiated the current action in this Court. On February 8, 2024, he brought claims against defendants under Section 1983, alleging deprivation of rights secured by the First Amendment of the United States Constitution; New York State Civil Service Law § 75(b) ("75(b)"), alleging unlawful retaliation; and the New York State Human Rights Law ("NYSHRL"), alleging gender-based discrimination, age discrimination, and retaliation. One week later, he moved for a preliminary injunction. *See* Unsigned Order to Show Cause, ECF No. 7 ("OTSC").

The Court held a show cause hearing at which plaintiff was asked to clarify his requests for relief and the status of plaintiff's 3020-a proceedings. The Court did not rule on plaintiff's request, but instead set a briefing schedule for the current motion.[3] Then, on July 11, 2024, the Court held an evidentiary hearing at which plaintiff cross-examined Ms. LaRegina.

Plaintiff contends that he will suffer irreparable harm by being "railroaded into a meritless disciplinary proceeding with an unwanted Hearing Officer who has refused to recuse himself," resulting in "very likely termination or an unduly harsh penalty in his position . . . ." Glass OTSC Decl. ¶ 20. Plaintiff explains that this will also result in "severe consequences to his livelihood and pension." Glass OTSC Decl. ¶ 20. After the Court's inquiry at the February 21 conference, plaintiff added an allegation of a "chilling effect" caused by Dr. Morrison-Raptis' "unprofessional and inappropriate" treatment of staff. Reply Mem. in Further Supp. of Pl.'s Order to Show Cause ("Reply") 11, ECF No. 22.

---

[3]     On February 20, defendants collectively requested a pre-motion conference in anticipation of moving to dismiss plaintiff's complaint. *See* Defs.' Pre-Mot. Conference Ltr., ECF No. 10. The Court is reserving judgment on that motion in light of plaintiff's representation that he intends to amend his complaint. *See* Joint Status Ltr. 2, ECF No. 32.

Defendants assert two grounds in opposition to plaintiff's motion especially pertinent to the discussion below: (1) this Court should abstain from hearing this case under *Younger v. Harris,* 401 U.S. 37 (1971), based on the ongoing parallel state administrative proceeding; (2) plaintiff has not suffered irreparable harm.

## DISCUSSION

I.   Younger *Abstention*

Defendants contend that, separate from whether plaintiff has met the requirements for injunctive relief, a preliminary injunction should not issue because *Younger v. Harris* and its progeny require this Court to abstain from exercising jurisdiction over this matter. 401 U.S. 37 (1971). I agree.

1.   *Younger* Abstention Applies

While a federal court's "obligation" to hear and decide a case over which it has jurisdiction is "virtually unflagging," *Trump v. Vance*, 941 F.3d 631, 637 (2d Cir. 2019), *aff'd and remanded*, 591 U.S. 786 (2020), *Younger* recognized a limited exception to that general rule. The *Younger* doctrine expresses a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Ingber v. N.Y.C. Dep't of Educ.*, No. 14-cv-03942, 2014 WL 2575780, at *3 (S.D.N.Y. June 9, 2014) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431 (1982)). This federal policy is rooted in concerns of "comity and federalism" which "require federal courts to be cognizant that the National Government will fare best if the States and their institutions are left free to perform their separate

8

functions in their separate ways." *Spargo v. N.Y. State Comm'n on Jud. Conduct*, 351 F.3d 65, 74–75 (2d Cir. 2003).[4]

Younger abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated by that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001). However, *Younger* abstention does not extend to all ongoing state proceedings. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81–82 (2013). Rather, *Younger* abstention only applies to certain classes of parallel proceedings, importantly here: "particular state civil proceedings that are akin to criminal prosecutions." *Id.* at 72–73.

The three conditions requiring *Younger* abstention are met here. *First*, there is clearly an ongoing state proceeding: the 3020-a hearing. Courts have repeatedly found that *Younger* applies to 3020-a hearings. *See, e.g.*, *Ford v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 19-cv-06327, 2019 WL 5865129, at *4 (S.D.N.Y. Nov. 6, 2019) ("Federal courts in New York have found proceedings under Section 3020-a to be the type of proceeding contemplated by *Younger*."); *Ingber*, 2014 WL 2575780, at *4 (noting that *Younger* applies to 3020-a proceedings and other state and county professional disciplinary proceedings). Indeed, professional disciplinary hearings have been found to "involve much more than private litigation between individual litigants" and interference in them is akin to disruption of "quasi-criminal" proceedings. *Anonymous v. Assoc'n of*

---

[4]     Throughout this Opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

*the Bar of City of N.Y.*, 515 F.2d 427, 432 (2d Cir. 1975) (finding disbarment proceedings as implicating "the state's interest in maintaining the standards of its criminal laws").

*Second*, there are clearly important state interests involved in this case. "It has long been recognized that matters involving schools, and the discipline of students and teachers[,] are principally matters of local concern, and that the state has vital interests in maintaining the proper and orderly functioning of its local schools." *Rubin v. Corning-Painted Post*, 190 F.Supp.2d 541, 544 (W.D.N.Y. 2002); *see also Ingber*, 2014 WL 2575780, at *4 ("Plaintiff does not, and could not, dispute that important state interests are implicated in [3020-a] proceedings[.]").

*Third*, the state proceedings afford plaintiff an adequate opportunity for judicial review of his federal constitutional claims. Plaintiff does not claim his federal rights will not be protected in the 3020-a proceedings, nor has he produced evidence that state courts "will be reluctant to entertain any legitimate objections [he] may have in the event that disciplinary sanctions are improperly imposed." *Mason v. Departmental Disciplinary Comm.*, 894 F.2d 512, 515 (2d Cir. 1990).

Thus, *Younger* abstention is required in this case. However, plaintiff argues that, even were *Younger* abstention to apply, its bad faith exception still justifies interference in state proceedings.

2. The Bad Faith Exception to *Younger* Abstention Does Not Apply

A proceeding that meets the *Younger* criteria may proceed in federal court if plaintiff shows that "the state proceeding was initiated with and is animated by a retaliatory, harassing or other illegitimate motive." *Levich v. Liberty Central Sch. Dist.*, 258 F. Supp. 2d 339, 342 (S.D.N.Y. 2003). This "bad faith exception" to *Younger* justifies the federal court's refusal to abstain where a "proceeding has been brought to retaliate for

or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass." *Schorr v. DoPico*, 686 F. App'x 34, 37 (2d Cir. 2017) (quoting *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir. 1994)).

This *Younger* exception is "intended to be narrowly construed." *Bruno v. Greenville Fire Dist.*, No. 14-cv-01917, 2014 WL 12778254, at *4 (S.D.N.Y. Apr. 14, 2014) (citing *Schlagler v. Phillips*, 166 F.3d 439, 443 (2d Cir. 1999)). And for an exception to apply, "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome" or the proceeding must be brought with "no legitimate purpose." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 199–200 (2d Cir. 2002). The burden is on plaintiff to establish the applicability of a *Younger* exception. *Id.* at 199.

Plaintiff argues that the bad faith exception should apply. Specifically, he argues that, based on his professional record over "15 years," the School District "has no reasonable expectation of obtaining a favorable outcome" in an "impartial" 3020-a proceeding. Reply at 10.

The record before the Court fails to demonstrate that the disciplinary proceedings initiated by the School District against plaintiff were "animated by a retaliatory, harassing, or other illegitimate motive." *Diamond "D" Const. Corp.*, 282 F.3d at 199. Even reviewing all evidence in plaintiff's favor, the record suggests a great likelihood that the School District initiated 3020-a proceedings against plaintiff for disciplinary, rather than retaliatory, ends.

For one, there is substantial evidence, corroborated by several witnesses and uncontradicted by plaintiff, that plaintiff acted in a manner the administration found inappropriate on school grounds on more than one instance. For example, on both June

12 and 14, 2023, several staff members reported plaintiff exhibiting reprehensible behavior. *See, e.g.*, Investigative Report 13, 19, 20, 21. On June 12, two of plaintiff's colleagues—including Ms. LaRegina—reported that plaintiff was "yell[ing]," speaking "aggressive[ly]" toward other employees regarding his room change, and exhibiting "intimidating," "demanding" behavior. Employee Statements 1, ECF No. 26; LaRegina Aff. ¶ 23; Investigative Report 19; LaRegina 3020-a Test. 458:6–459:25.

Colleagues also reported that, on June 14, plaintiff was even "more agitated than last time." Investigative Report 20. He was "behaving in an aggressive way," "threatening," "yell[ing]," and was "red in the face," all while families were present for a Kindergarten graduation ceremony. Investigative Report 20; LaRegina Aff. ¶¶ 27–28. At the evidentiary hearing, Ms. LaRegina testified that on June 14 plaintiff "got so aggressive" that she "did not feel safe in [the] building with him working that day," Hr'g Tr. 56:14–23, and that in "all of [her 25] years in education," she had "never had an interaction with a colleague" as she did with plaintiff on June 14, Hr'g Tr. 56:1–4.

Furthermore, evidence shows that plaintiff was placed on administrative leave and scheduled for a Section 913 psychiatric examination *prior* to most, if not all, of the complaints mentioned in his various Order to Show Cause filings. *See* June 14 Recording 10:40–11:04; 913 Req. Email, ECF No. 20-1 (reflecting consultation scheduling on June 21, 2023). In fact, plaintiff's counsel informed the Court that plaintiff filed his New York State Division of Human Rights ("SDHR") complaint no earlier than August 31, the day of plaintiff's Section 913 evaluation. Hr'g Tr. 68:1–14.[5] Moreover, evidence recorded *by*

---

[5]     Plaintiff also fails to demonstrate why the Court should not rely on the findings of Dr. Solomon, the outside independent psychiatrist, or explain why Dr. Solomon would deem him unfit to teach for retaliatory reasons. Absent supporting evidence, the Court

plaintiff on June 14 suggests that administration members, unaware that they were being recorded, expressed concern about plaintiff's actions in real time. The same recording also demonstrates that his colleagues seemed to be concerned for plaintiff's well-being. LaRegina Aff. ¶ 34; June 14 Recording 05:32–06:02. Before this Court, Ms. LaRegina testified that she had "never seen [plaintiff] behave the way he behaved [at] the end of June" and had "never had an interaction with a colleague" as she did on June 14. Hr'g Tr. 56:1–17. While plaintiff repeatedly alleges that defendants disciplined him in retaliation for previous complaints, this evidence controverts his claims.

Plaintiff produces no other evidence to suggest any likelihood of retaliatory intent motivating the 3020-a disciplinary proceedings. Plaintiff's claims that school actors displayed "malevolent intent" are unsubstantiated. For example, plaintiff strains to cast Ms. LaRegina's suggestion that he bring Dr. Morrison-Raptis "flowers" as evidence of malevolent intent. *See* Reply at 8. But plaintiff makes no effort to explain—as is his burden—why such a statement would not be a reference to Dr. Morrison-Raptis' birthday that very same day. *See* LaRegina Aff. ¶ 19; Sept. 22, 2022[6] Recording ("Sept. 22 Recording") 02:39–:58, 05:52–07:26, ECF No. 20-5 (audio on file with the Court). Ms. LaRegina's unrefuted testimony that she had "always had a great relationship with [plaintiff]" makes it even less likely that she referenced "flowers" for any other reason

---

refuses to further engage with one of several veiled and baseless malpractice accusations on the record. *See also, e.g.*, Jan. 24 Hr'g Tr. 10:23-15:22, ECF No. 15-1 (Mr. Peek); NYSUT Emails (Corrected) 2, ECF No. 12 (Ms. Mikhail); Hr'g Tr. 89:9–25 (School District counsel).

[6]     Despite previously representing that this recording was from a "September 22, 2023" meeting, *see* Glass Decl. ¶ 12, ECF No. 21, plaintiff clarified at the evidentiary hearing that this recording took place on September 22, 2022, Hr'g Tr. 29:20–25.

than to "use humor" to "diffus[e] a situation" she thought could "escalate[]." Hr'g Tr. 64:22–65:9.

Plaintiff also suggests retaliatory intent through reference to Ms. LaRegina's alleged retort that the administration does not "get supplies for those who complain." *See* Reply at 8. For one, Ms. LaRegina denied making this statement under oath. Hr'g Tr. 15:20–22. Furthermore, the independent investigation prompted by plaintiff's harassment claim found that plaintiff could not even corroborate that "any materials or supplies that were requested were denied to him." Investigative Report 27. To date, plaintiff has still not presented persuasive evidence to demonstrate such a denial.

Plaintiff also asks the Court to infer "malevolent intent" from the School District instituting 3020-a proceedings after he filed a litany of formal complaints primarily concerning (i) the spraying of Virex and (ii) disparate treatment on the bases of age and sex. The School District did bring formal 3020-a charges after many of plaintiff's complaints. At the same time, it is also true that the 3020-a hearings were initiated in response to events that the School District credibly determined warranted discipline, namely: (1) a psychiatric examination concluding that plaintiff was "incompetent to perform his duties as a teacher," and (2) plaintiff's behavior on June 12 and 14, 2024. *See* 3020-a Charges 1–2, ECF No. 7-3. Thus, plaintiff's conclusory arguments that the 3020-a proceedings were initiated in response to his complaints—rather than his conduct, the Investigative Report findings, or the Section 913 evaluation results—are insufficient to carry his burden of demonstrating retaliatory intent. [7]

---

[7]    Plaintiff separately claims that, on or about November 29, 2023, the School District's counsel called plaintiff's counsel "threatening" to bring 3020-a charges if plaintiff did not resign. Glass OTSC Decl. ¶ 7; Hr'g Tr. 89:9–25. However, there is no

To find that plaintiff demonstrated retaliatory discipline by the School District and its agents, the Court would need to embrace, to use plaintiff's words, an "uneasy feeling" over a robust library of evidence. Reply at 10. But burdens are met through proof, not conclusions and unfounded assertions. *Kirschner v. Klemons*, 225 F.3d 227, 236 (2d Cir. 2000) ("Mere conclusory allegations of bias are insufficient to overcome *Younger*—a plaintiff seeking to avoid *Younger* must affirmatively demonstrate the justification for application of an exception."). Here, defendants overcame a burden that plaintiff was required to, but never did, meet. Therefore, the Court abstains from hearing plaintiff's grievances concerning his disciplinary proceedings.

II.  *Preliminary Injunctive Relief*

Even were the Court to find an exception to *Younger*, plaintiff would not be entitled to a preliminary injunction. This is because, at the very least, plaintiff has not met "the single most important prerequisite for the issuance of a preliminary injunction: irreparable harm." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 358 (2d Cir. 2024).

"A party seeking a preliminary injunction in this Circuit must establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3)

---

evidence that District counsel attempted to negotiate plaintiff out of his job, much less "threaten" bringing 3020-a hearings, and such "allegations are too conclusory and barebones to serve as the factual predicate for a plausible finding of bad faith." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp. 3d 342, 355–56 (E.D.N.Y. 2016), *aff'd in part, dismissed in part*, 712 F. App'x 24 (2d Cir. 2017).

that a preliminary injunction is in the public interest." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 215 (2022).

A plaintiff seeks a mandatory injunction when he seeks to "alter, rather than maintain, the status quo." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (citing *Tom Doherty Assoc., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). Courts apply a "heightened standard" to requests for mandatory injunctions under which plaintiffs must "show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667, 669 (2d Cir. 2023). This standard demands more than the "clear showing" otherwise required for preliminary injunctions. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 498 (S.D.N.Y. 2013). Parties seek mandatory injunctions when they attempt to halt disciplinary proceedings and are held to this higher standard. *Bruno*, 2014 WL 12778254, at *6.

1.  Irreparable Harm: Standard

To show irreparable harm, the moving party must establish that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Juicy Couture*, 930 F. Supp. 2d at 498 (citing *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). A movant must meet this standard even where he asserts constitutional harm.

Mere assertion of a constitutional injury, such as a First Amendment harm, is insufficient to establish irreparable harm. *See A.H. by and through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). Instead, irreparable harm is satisfied when "the

constitutional deprivation is convincingly shown and that violation carries noncompensable damages." *Blakeman v. James*, No. 24-cv-01655, 2024 WL 3201671, at *18 (E.D.N.Y. Apr. 4, 2024) (citing *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012)); *see also Garland v. N.Y.C. Fire Dep't*, 574 F. Supp. 3d 120, 132 (E.D.N.Y. 2021). That is, constitutional harm is irreparable where it cannot be remedied through money damages. Many courts in this circuit have "distinguished between a plaintiff whose First Amendment rights are directly regulated or restrained and one who retains her First Amendment rights but has suffered only economic injury in the pursuit thereof." *Lost Lake Holdings LLC v. Town of Forestburgh*, No. 22-cv-10656, 2023 WL 8947154, at *6 (S.D.N.Y. Dec. 28, 2023). In the latter instance, although the claim involves constitutional harm, "the injury itself is compensable by money damages and, therefore, not irreparable for the purposes of a preliminary injunction." *Id.*

### 2.  Disciplinary Proceedings as Harm

Plaintiff seeks two alternate injunctive remedies. Primarily, plaintiff seeks to enjoin defendants from seeking further adverse employment actions, including "termination of [his] employment pursuant to New York State Education Law Section 3020-(a) and (b)" (the "Primary Remedy"). *See* OTSC ¶¶ 1, 2. In the alternative, plaintiff seeks to restrain defendants "from proceeding with the Section 3020-a hearing without assignment of a new hearing officer" (the "Alternative Remedy"). OTSC ¶ 3.[8] *Id.* Because the remedies implicate different harms, the Court analyzes each separately.

In support of his Primary Remedy, plaintiff's Order to Show Cause posed two "irreparable" injuries: (1) being "railroaded" into a disciplinary proceeding he suspects

---

[8]      Plaintiff's original Order to Show Cause also requested cancelation of a prehearing conference since passed. OTSC ¶ 3. This request is now denied as moot.

will be unfair; and (2) the possibility of "very likely termination" or "an unduly harsh penalty in his position with the District." *See* Glass OTSC Decl. ¶ 20. However, plaintiff has not established that these injuries cannot be adequately redressed by money damages.

Plaintiff's mandatory participation in disciplinary hearings does not constitute irreparable harm. This is true even if plaintiff believes such proceedings are "meritless." *See* Glass OTSC Decl. ¶ 20. This is because his forced participation in 3020-a proceedings is clearly compensable and therefore adequately reparable. *See, e.g.*, *Levich*, 258 F. Supp. 2d at 344 (finding no irreparable harm where teacher "suffered no financial loss" while being subjected to 3020-a proceedings); *Pinckney v. Bd. of Educ. of Westbury Union Free School Dist.*, 920 F. Supp. 393, 400–01 (E.D.N.Y. 1996) (finding no irreparable harm even where a school district superintendent was suspended *without* salary and benefits because he could be "awarded back pay and the value of any lost benefits" upon prevailing in subsequent judicial proceedings). Indeed, plaintiff continues to receive full pay and benefits throughout the pendency of 3020-a hearings. *See* Feb. 21 Hr'g Tr. 28:16–17, ECF No. 16-2. Not only is lost pay compensable, plaintiff does not allege having lost pay at all.

Nor is the likely possibility of termination or an "unduly harsh penalty in [plaintiff's] position with the District," Glass OTSC Decl. ¶ 20, irreparable harm. As above, termination from employment is curable not only by damages (including backpay and lost benefits), but also reinstatement. *See Jansen*, 2023 WL 6160691, at *4 (citing *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988)) ("Indeed, because reinstatement and money damages could make plaintiff whole for any loss suffered during the period she did not retain her position, the injury is plainly reparable and plaintiff has not demonstrated the type of harm entitling her to injunctive relief.").

18

Petitioning this Court for preliminary relief is not plaintiff's only recourse either. After completion of his 3020-a proceedings, plaintiff is free to challenge his disciplinary hearing through an Article 78 proceeding in New York state court. *See, e.g.*, *Williams v. N.Y.C. Dep't of Educ. ex rel. City Sch. Dist.*, No. 12-cv-08518, 2013 WL 5226564, at *10 (S.D.N.Y. Sept. 17, 2013) (explaining that Article 78 provides teachers penalized through 3020-a proceedings "an avenue for challenging [their] termination as arbitrary and capricious and contrary to law") (quoting *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.*, No. 09-cv-05251, 2013 WL 3820671, at *6 (E.D.N.Y. July 24, 2013)); *see also* N.Y. C.P.L.R. § 217(1) (stating the Article 78 statute of limitations: "within four months after the determination to be reviewed becomes final and binding upon the petitioner[.]").

Relatedly, plaintiff's Alternative Remedy argument—that he will be irreparably harmed if defendants are not restrained from proceeding with the 3020-a hearing until a new hearing officer is assigned—is without merit. Plaintiff has presented no evidence suggesting that Mr. Peek, the hearing officer, is a partial or conflicted arbitrator.[9] Therefore, he has not come close to meeting his burden of demonstrating that he will be harmed absent the Alternative Remedy. Nor has plaintiff alleged why enduring a disciplinary proceeding with a biased arbitrator would constitute irreparable harm. As noted above, forced participation in 3020-a hearings is compensable; especially where,

---

[9]      The record contains no evidence suggesting that Mr. Peek is biased. *See, e.g.*, Jan. 24 Hr'g Tr. 10:23-15:22 (summarizing Plaintiff's claims that Mr. Peek is conflicted and denying Plaintiff's motion to recuse); Mar. 12 3020-a Hr'g Tr. 70:23–71:11, ECF No. 24-1 (reiterating this decision and observing that plaintiff adduced no proof in state court that Mr. Peek was impartial); Recusal Aff. ¶¶ 1–11 (raising no issues with Mr. Peek's neutrality besides "adversarial circumstances" resulting from Plaintiff's objection to Mr. Peek's selection). Therefore, the Court is particularly unpersuaded that the injunctive relief sought bears a "causal connection" to the irreparable harm here claimed. *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 350 (2d Cir. 2003).

as here, plaintiff has not lost salary or benefits. *See Jansen*, 2023 WL 6160691, at *4 (citing *Savage*, 850 F.2d at 68); *Levich*, 258 F. Supp. 2d at 344.[10] The possibility that a hearing officer could be biased does not change that. *See Pompano-Windy City Partners, Ltd. v. Bears, Stearns & Co.*, 698 F. Supp. 504, 519 (S.D.N.Y. 1998) (declining to find irreparable harm on the basis that an arbitration was biased because "[i]f the arbitration were in fact biased, plaintiffs could challenge that award and, if successful, it will have no effect"). The Court is even less inclined to find irreparable harm where plaintiff is free to challenge perceived bias in his own disciplinary hearing through an Article 78 proceeding. *Trustees of Plumbers Loc. Union No. 1 Welfare Fund v. Riverdale Assocs., LLC*, No. 07-cv-01740, 2007 WL 1876593, at *4 (E.D.N.Y. June 28, 2007) ("The fact that there is a legal remedy which Movants can pursue if the arbitration process proves biased or unfair undercuts Movants' claim of irreparable harm.").

    3. Chilling as Harm

    The Court's inquiry could end here. The disciplinary hearing injuries above are all that plaintiff alleged in his Order to Show Cause filings, and courts need not consider an argument raised by a represented party for the first time in a reply brief. *See Williams v. Suffolk Cnty.*, 284 F. Supp. 3d 275, 283 (E.D.N.Y. 2018) (citing *Keefe on Behalf of Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995)). Nonetheless, plaintiff's reply brief also alleges "*per se*" irreparable harm flowing from violations of his First Amendment rights. Reply at 8. Because defendants were put on notice of this argument at the Court's

---

[10]    Because the Court finds no irreparable harm to enjoin proceedings without assignment of a new hearing officer, it does not address plaintiff's requests to "provide Plaintiff with an opportunity to review a new American Arbitration Association list before selection of a hearing officer and receive a determination whether his union will provide him alternative counsel in light of the conflict(s) arising with the previously assigned counselor." *See* OTSC ¶ 3.

February 21 hearing and subsequently addressed it in their opposition brief, Opp'n at 7–8, the Court finds they would not be "unfair[ly] prejudice[d]" if the Court considers plaintiff's late argument. *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-cv-02843, 2010 WL 3310262, at *4 (E.D.N.Y. Aug. 19, 2010); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (noting that "the district court had discretion to consider" an argument first made in a reply brief).

Plaintiff's Reply claims, in essence, that the administration's threatening and retaliatory behavior will irreparably chill his and his coworkers' First Amendment freedom of speech absent preliminary relief. He asserts two species of "chilling" harms. *First*, he suggests that his own speech will continue to be chilled by the School District "for making or trying to make protected complaints of discrimination and harassment about administrators." Reply at 11. *Second*, he suggests that his coworkers will have their speech chilled: based on the "administrator's bullying tactics," teachers "very likely will forgo availing themselves of federal and state rights . . . in fear of having 3020-a proceedings instituted against them." Reply at 11–12.

As noted above, courts have drawn a distinction between irreparable harm taking the form of a constitutional violation in its own right, and harm resulting from the exercise of a constitutional right. *See Lost Lake Holdings*, 2023 WL 8947154, at *6; *see also Talukder v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 22-cv-01452, 2023 WL 3675920, at *6 (S.D.N.Y. May 26, 2023) ("[A] difference exists between situations in which a person has lost his [F]irst Amendment right and has retained his employment, and situations in which a person has lost his employment but retained his First Amendment rights."). Where a plaintiff asserts that he is irreparably harmed by the very violation of his constitutional right, "the two prongs of the preliminary injunction

threshold merge into one" such that he must demonstrate that he is likely to succeed in showing that constitutional violation. *Blakeman*, 2024 WL 3201671, at *18. This makes sense: if a plaintiff is unlikely to establish a constitutional violation, he cannot in the same breath claim that violation will irreparably harm him.

As far as plaintiff makes a personal chilling argument, it fails. Plaintiff does not "convincingly show" that the School District has violated his First Amendment speech rights. To establish a First Amendment free speech violation, a plaintiff must show, in part, "defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). That plaintiff has continued to speak publicly on this matter—even during the pendency of his disciplinary hearings— shows he has not been chilled from exercising his First Amendment rights. *See id.* at 73 ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). Indeed, as of March 6, plaintiff had used his public Facebook page to protest the School District's use of Virex and share details of proceedings before this Court. *See* Kleinberg Decl. ¶ 8, ECF No. 16-1; Siracusa Facebook Screenshots, ECF No. 16-3. In short, plaintiff's potential damage is "loss of income, not the loss of First Amendment rights." *Shady v. Tyson*, 5 F. Supp. 2d 102, 108 (E.D.N.Y. 2018). Plaintiff therefore has not demonstrated a likelihood of success on any free speech claim.

Furthermore, even if plaintiff could demonstrate that his speech was chilled, such a chill would stem not from an interim discharge but from the fear of "the permanent loss of plaintiff's job." *Shady*, 5 F. Supp. 2d at 107–08. Second Circuit courts have repeatedly pointed out that a preliminary injunction is inappropriate in these circumstances because interim relief would not address permanent discharge and, if plaintiff prevails on the

merits, "reinstatement and money damages could make" him "whole for any loss suffered" during the pendency of this action. *Id.* at 107; *see also Mullins v. City of N.Y.*, 307 F. App'x 585, 588 (2d Cir. 2009) ("In the context of First Amendment retaliatory discharge cases, we have observed that preliminary injunctive relief would likely be ineffective, because the alleged irreparable harm—the chilling of protected activity—stemmed not from the interim discharge but from the threat of permanent discharge, which is not vitiated by an interim injunction."). As such, a preliminary injunction is an inappropriate remedy for plaintiff, who, in exercising his First Amendment rights, suffered adverse employment consequences that can be made whole through litigation.

Plaintiff also alleges irreparable harm by claiming that the speech of other employees would likely be chilled by defendants' conduct. The Second Circuit has recognized that the risk that "other employees may be deterred from protecting their rights" or from "providing testimony for plaintiff in [his] effort to protect [his] own rights" may constitute irreparable injury. *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 91 (2d Cir. 1983). However, a plaintiff relying on this argument must offer evidence supporting that risk of intimidation. *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 511–12 (2d Cir. 2005). Here, plaintiff must make a strong showing of this type of harm. *Garland*, 574 F. Supp. 3d at 132. He has not. Nor has he even shown that his discipline was known or at all significant to his coworkers.

The sole piece of evidence he produces to this effect is an affidavit from his wife stating, in sum and substance, that (1) a School District cleaner was told by unnamed

"school administrators" not to talk about "Plaintiff's case"[11] and the spraying of Virex; (2) she observed two unidentified teachers appearing "extremely nervous" when the superintendent was nearby; (3) a kindergarten teacher chose not to write an affidavit in support of plaintiff "for fear of retaliation" by the school administration; (4) Dr. Morrison-Raptis behaved in a "hostile and threatening" manner to staff; and (5) she has spoken to "several current and former employees" who did not want to help her husband due to the administration's retaliation. K. Siracusa Aff. ¶¶ 2–6, ECF No. 21-4.[12] This affidavit does not meet the "strong showing" requirement for irreparable harm. It is conclusory and provides scarce factual detail beyond general attestations that other employees fear complaining to Dr. Morrison-Raptis. *See Am. Postal Workers, AFL-CIO v. U.S. Postal Service*, 766 F.2d 715, 722 (2d Cir. 1985) (finding that a "conclusory assertion that [plaintiff's] discharge chilled the will of" other postal workers was insufficient to establish irreparable harm).

Nor will the Court assume irreparable harm based on plaintiff's unevidenced conclusion that administrators' involvement in an official investigation into his harassment claims chilled his coworkers' speech. *See* Glass Reply Decl. ¶ 15. Ms. Cacavas, an independent consultant and former Administrative Law Judge of 25 years, was hired

---

[11]    Plaintiff's wife fails to specify whether the "cleaner" was instructed "not to talk about" Mr. Siracusa's harassment complaint, his 3020-a proceedings, or his federal action.

[12]    Plaintiff also submitted an untimely "supplemental affidavit" from his wife in support of his chilling argument. *See* Suppl. K. Siracusa Aff. ¶ 2, ECF No. 32-2. Even were the Court to consider this supplemental affidavit, it would find it unpersuasive. Ms. Siracusa's claims connecting an open house visitor to the school district by many degrees of separation render them nonsensical. Notably, the affidavit fails to explain why it is more likely any employees failed to testify due to fear of retaliation rather than loss of interest.

by the School District's Board of Education to investigate complaints made by plaintiff. Investigative Report 3. She explained to each interviewee that she has "no relationship with any party." Investigative Report 6.  To the extent administrators were present, defense counsel explained that their presence would have been *requested* by interviewees. Hr'g Tr. 82:6–24. And it seems that, while administrators were present in a few employee interviews, *union representatives* were present in more. Investigative Report 11, 16, 17, 19, 21; Hr'g Tr. 82:6–83:16. Plaintiff can attempt to discredit Ms. Cacavas' assessments with convincing evidence in his 3020-a proceedings, any judicial review that might follow, or any later actions in federal court. However, he has not presented convincing evidence that other employees will be deterred from speaking out "in fear of being brought up on 3020-a termination charges." Reply at 12.

Plaintiff cites *Stagliano* to encourage a finding of this type of irreparable harm. Reply at 6–7 (citing *Stagliano v. Herkimer Central School District*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015)). But *Stagliano* differs from this case both in the volume and quality of evidence presented at the preliminary injunction stage. There, Marla Stagliano, a physical education teacher and mother of triplets, sought a temporary restraining order to halt 3020-a proceedings brought against her for absences necessitated by childcare. Stagliano's request for preliminary relief was granted based on an expansive record evincing the school district's clear and widespread intolerance for faculty members taking leave to care for themselves or their family members. The *Stagliano* record was materially different than the record before the Court: Stagliano submitted six affidavits from *named* "faculty members discussing their reluctance and fear over taking sick leave" as well as information on others who were "afraid to either come forward to assist in the litigation or to ask for sick leave." *Id*. at 273. One affidavit also suggested that another teacher was

disciplined for taking leave only after Stagliano took action against the school district. *Id.* at 269. Here, plaintiff offers an affidavit from his wife riddled with conclusory statements. Unlike in *Stagliano*, that affidavit does not claim any retaliatory discipline postdating plaintiff's various complaints against the School District that would support a risk that his coworkers' speech will be chilled.[13]

Thus, plaintiff has failed to make a "strong" showing that either (1) any claimed injury could not be compensated by money damages, or (2) any of defendants' actions risk a chilling effect on plaintiff or other employees during the pendency of this litigation.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is **DENIED** without prejudice.

**SO ORDERED**.

                            ___*/s/ Natasha C. Merle*___
                            NATASHA C. MERLE
                            United States District Judge

Dated:       August 19, 2024
              Brooklyn, New York

---

[13]    Furthermore, *Stagliano* involved a different type of potential harm—choosing not to take sick leave to care for a child, from which chronic health issues or contagious diseases might develop—"for which money damages would be inadequate." *Id.* Once again, the harm alleged here can be remedied by reinstatement and monetary relief. *Jansen*, 2023 WL 6160691, at *4.